Common Pleas Court of Trumbull County.

IN THE MATTER OF THE COMPLAINTS AGAINST CHARLES H. WOODWORTH, WARREN THOMAS, ARTHUR B. LEVENBERG ET AL.

Decided January 16, 1933.

*W. W. Pierson, Harvey A. Burgess, Wm. W. Weir, J. D. Campbell* and *Paul Kightlinger*, prosecuting committee.

*C. M. Wilkins, Jay Buchwalter, S. C. Graber, A. B. Clark, Moidel & Moidel, William M. McLain, H. I. Gardner*, for respondents.

BEFORE JUDGES JAMES C. OGLEVEE, PHILIP L. WILKINS, and J. D. BARNES.

On or about December 9, 1932, there was regularly filed in the office of the clerk of courts of Trumbull county, Ohio,

separate written charges against five attorneys at law of the Trumbull county Bar.

Before the filing of the complaints the necessary preliminary steps had been taken and a committee of lawyers duly appointed with instructions to prepare and file in this court written charges and specifications against each of the five lawyers.

The several complaints are numbered and identified by name as follows: No. 35641 *In re charge* v. *Kenneth McNair*; No. 35642 *In re charge* v. *Arthur B. Levenberg*; No. 35643 *In re charge* v. *Barrett F. Brown*; No. 35644 *In re charge* v. *Charles H. Woodworth*; No. 35645 *In re charge* v. *Warren Thomas*.

Copy of the several complaints were served on the respective attorneys and thereafter answers were filed by each to the separate charges.

Trial day was set for January 9, 1933, and on request of the Chief Justice of the Supreme Court of Ohio, three Common Pleas Judges from distant counties were assigned to hear and determine said complaints.

Trial of these cases was taken up in the order of their number. Decision was reserved until the close of the evidence in all five cases.

While the charges and specifications against each lawyer were separate and distinct, yet they all are of the same general character and by reason thereof all general specifications will be applicable to each.

Under these circumstances it is deemed best to treat the several cases in one opinion devoting separate pages to the determination of facts and law applicable thereto as to specifications against each defendant.

The right to practice law is a special privilege granted by judicial authority.

It is a continuing privilege only to be divested in the exercise of a sound and judicial discretion after formal complaint, notice and hearing.

Every applicant for admission to the Bar must present a certificate of good moral character and it is contemplated that he will guard and maintain this cardinal virtue during his professional career.

Likewise every applicant for admission to the Bar must take a formal oath which is unique in that it is not a requirement in any other profession.

From time to time the American Bar Association as well as the Bar Association of this state has enacted canons of professional ethics.

"In neither canon nor oath is there addition to the implied obligation of an attorney as they have been understood for generations by the honorable and the right minded who appreciate the importance of the lawyer's function." *In Re Disbarment Thatcher*, 83 O. S. 233.

Absolute honesty and fidelity to clients is an obligation owing by every lawyer even to the point that his own interest will be held subordinate to those of his client.

When the Supreme Court grants the privilege to practice law this is an implied finding that the applicant is of good moral character and will deal with honesty and fidelity to the interest of his clients.

Courts resent with righteous indignation whenever it finds that any lawyer has violated the confidence of the Supreme Court in having conferred upon him the special privilege to practice law.

The very existence of the relationship of attorney and client raises a presumption that relations of trust and confidence exist between the parties. In his dealings with his client therefore the attorney is bound to the strictest honesty and fidelity. The discharge of his professional duties requires that the client repose in him unreserved confidence and the law demands that he act towards his client in the utmost good faith.

During the existence of the relations of attorney and client there is always a presumption of invalidity where an undue advantage is obtained by the attorney.

Whenever it is made to appear to the court that an attorney is no longer worthy of the trust and confidence of the public and of the courts it becomes not only the right but the duty of the courts which made him one of its officers and gave him the privilege of ministering within its bar to withdraw the privilege.

A court should not hesitate for a moment to exercise the discretion with which it is clothed by the law to purify the law of official delinquency.

This is required in order to uphold its own dignity and to preserve the character and integrity of the whole profession from scandal and misrepresentation.

The right of Common Pleas Courts to suspend or dispel is controlled by statute and not pursuant to any inherent authority. *In Re Hawke,* 107 O. S. 349.

Section 1707, G. C. prescribes the derelictions which makes an attorney at law amenable to summary action.

The pertinent part of this section reads as follows:

"The Supreme Court, Court of Appeals or Court of Common Pleas may suspend or remove an attorney at law from office or may give or public reprimand to him as the nature of the offense may warrant for misconduct or unprofessional conduct in office involving moral turpitude or for conviction of a crime involving moral turpitude."

In the cases under consideration no charge is made of any conviction of crime.

The sole question for determination as to each and all of the respondents on question of guilt is the following:

Does the complaint and specification charge and the evidence prove "misconduct or unprofessional conduct in office involving moral turpitude?"

It is very hard to make any distinction between the words "misconduct" and "unprofessional conduct" as the same are used in Section 1707, General Code.

Certainly "unprofessional conduct in office involving moral turpitude" would be "misconduct." And likewise misconduct in office involving moral turpitude would be unprofessional conduct.

If a construction is given by which the word "misconduct" stands alone and is compared with the words "unprofessional conduct in office involving moral turpitude" then we could give a different meaning to the two words.

Neither the punctuation, grammatical construction nor a rule of reason would warrant such an analysis of the sentence. Both words "misconduct" and "unprofessional conduct" are qualified by the words "in office involving moral turpitude."

The words "misconduct or unprofessional conduct in office" relate primarily as the language indicates to such acts of commission or omission as take place in the character of an attorney as such as distinguished from his acts as an individual.

It is clear the statute contemplates a distinction between the official conduct of an attorney and his private conduct. *In Re Byrkett,* 3 N. P. 28, *In Re Bickley,* 16 O. Dec. 569.

In two of the cases under consideration motions were made and argued contending that certain specifications did not charge misconduct in office and asked that no evidence be permitted nor considered on these specifications.

The cases in which these motions were made are No. 35644 *In re Woodworth* and No. 35645 *In re Thomas,* specifications three, four and five.

Motion was sustained as to specification No. 5 *In re Thomas* and the same principle will be applicable to specification No. 2 *In re McNair.*

*In re Woodworth, supra,* contained only one specification in the complaint and this specification together with specifications Nos. 3 and 4 Thomas, *supra,* were very similar in general character.

Each was acting in a fiduciary capacity by authority of a court appointment. Mr. Woodworth as a receiver appointed by the Court of Common Pleas of Trumbull county, Ohio, and Mr. Thomas as an administrator in specification No. 3 and an executor in specification No. 4 appointed by the Probate Court of Trumbull county, Ohio.

Conversion, defalcation, failure to account and refusing to obey legal orders of court is charged in each of these specifications.

While these specifications charge gross misconduct yet it was urged in the motion that the respondents as to these specifications were not guilty of misconduct in office; that they were acting in an individual capacity and not as attorneys at law.

These motions were overruled in oral opinion and we still adhere to the announcement therein made.

Attorneys at law acting as receivers, administrators, executors or other fiduciaries under appointment of court are thereby acting as an arm of the court. Not only are they

acting as an individual but also as lawyers in the administration of justice.

The proper handling of funds by a fiduciary requires legal learning and skill and when a lawyer is appointed to such a position it is contemplated that he will use his legal acumen in the proper handling of the trust.

A layman would require the assistance of a lawyer to guide him in the performance of his duties. A lawyer who would advise his fiduciary client to convert to his own use trust funds would unquestionably be guilty of misconduct in office involving moral turpitude.

When a lawyer is appointed as a fiduciary he is not thereby divested of his membership in the profession.

In most instances his appointment is desirable because he can take with him in the administration of the trust his knowledge of the law. He acts in the dual capacity of individual and lawyer. If the trust is administered with great skill credit is given as a lawyer. Should it be said that if he converts trust funds to his own use, refuses to account and fails to obey legal orders of the court that censure should not attach to him as a lawyer.

If the lawyer fiduciary with expert knowledge of his duties is unable to impress upon himself as an individual obligations of honesty and integrity on the administration of his trust we can conceive of no stronger evidence of the unfitness of such individual to continue in the practice of law.

It is the unanimous conclusion of this court that these specifications against the respondents, Woodworth and Thomas, charge misconduct and unprofessional conduct in office and the evidence relative thereto should be considered in our findings.

We think reported decisions of our Ohio courts support this conclusion. *In Re Barnes,* 1 Abstract 410; *In Re Rothenberg,* 10 Abstract 677; *In Re Bickley,* 16 Ohio Dec., 569— syl. 6. Also 4 O. J. Sec. 139.

*In Re Bickley* was cited by counsel for respondents in opposition but a careful and full reading of the opinion will show that syllabus 6 and the opinion on page 580 support our conclusions.

We would like to be understood that we are not basing our conclusions on the principle of *stare decisis* but if neces-

sary as an original announcement of what the law is and what it ought to be.

The remaining question involves the definition of the term "moral turpitude" as used in Section 1707, G. C.

The term has a very broad and flexible meaning depending on the question concerning which it is intended to apply.

As applied to the several cases now under consideration we do not think the contention could be made but what all specifications in all complaints do involve moral turpitude.

The only question is whether or not the charge of misconduct or unprofessional conduct in office has been proven.

If proven, they do involve moral turpitude.

One member of this court together with two associates sitting in Columbus, Ohio, in the trial of a case *In re Bostwick,* 29 N. P. N. S. 21, was called upon to determine the meaning of the term "moral turpitude." Refer for matter to page 29 of the opinion.

A short and acceptable definition as applied to these cases is the following:

"Anything done contrary to honesty and fidelity to client or trust."

We now take up and consider in order the complaints:

### CHARGES AGAINST KENNETH MCNAIR.

In this proceeding the respondent, Kenneth McNair, an attorney at law practicing at the Trumbull county bar, is charged by the committee appointed by the court, with misconduct and unprofessional conduct in office, involving moral turpitude, in collecting and converting to his own use certain money belonging to a client who had placed a promissory note in his hands for collection.

It is averred in the specifications in this case that the Second National Bank of Warren, Ohio, on or about the 15th day of December, 1931, gave to respondent a note for $200.00 for collection, against the makers, J. D. Thorpe and Herbert & Wolf, on which he collected the sum of $40.-00, and for which he failed to account up to the time the complaint herein was filed.

The respondent admits in his answer the collection of the sum of money mentioned, and avers that he paid the same to the bank on Decemer 10, 1932.

It appears from the evidence contained in the record that in the fall of 1931, the Second National Bank of Warren placed in the hands of the respondent for collection some five or six promissory notes, or at least engaged him to try to collect the notes giving him the necessary data for that purpose, although the notes probably were not actually delivered to him.

At the time of this transaction the respondent was indebted to the bank on an account for the rent in the sum of $200.00, and also on a note for $150.00, and the parties both testify that it was mutually understood and agreed that whatever attorney fees would be coming to respondent for his services in making the collections should be applied on his indebtedness to the bank. Under this arrangement the respondent was to receive or retain no part of the money collected for his attorney fees, but all money collected was to be turned over to the bank. It seems that nothing was said about the amount of his fees, or whether he was to handle the collections solely upon a commission basis, or whether he should have a right to charge for his services regardless of the amount collected. However, that is immaterial, inasmuch as he was to retain no money but was to pay it all over to the bank.

During the winter of 1932, the respondent collected on said notes the sum of $30.00, which he duly paid over to the bank on or before March 2, 1932, and no complaint is made with respect to this part of the collection. But thereafter between said date and June 3, 1932, the proof shows and in fact the respondent admits that he collected an additional $40.00 on the notes, and it is in reference to that matter that he is now before the court.

The cashier of the bank testifies that on April 15, 1932, the respondent reported the collection of $20.00 which was not then paid in, and that following that report he made frequent demands personally and by phone for settlement, without success; and that thereupon he placed said notes in the hands of another attorney for attention and collection, with the result that he discovered by receipts from the

debtors that $10.00 had been paid on the Thorpe note, on May 10, 1932, and a like amount on June 3, 1932, of which no report had been made by respondent. Future efforts to secure settlement by the respondent of the $40.00 which he had collected and not accounted for, having proved of no avail, complaint was filed with the committee and as a result this proceeding was instituted.

By way of defense it is claimed by respondent that he did not appropriate or convert this money to his own use, but kept it in a tin box in the office, or at least he claims he had at all times an amount in the tin box equal to this unpaid balance. He does not, however, undertake to explain why he did not settle with the bank promptly on demand, which it was his duty to do.

We are not favorably impressed with the respondent's explanation, but rather incline to the belief that he converted the $40.00 in question to his own use, and failed to pay it over either because he did not have sufficient funds, or because he had made up his mind not to pay the bank this money if he could avoid it. His conduct in sending the money to the bank by another party after he discovered that he was about to be cited before the bar of the court for malpractice, can of course not purge the offense of wrongful conversion, if it had once been committed. Repentance and restitution, however, even at a late day may merit consideration, and furnish the basis for some extenuation.

The wrongful conversion of money collected for a client by an attorney at law, constitutes unprofessional conduct in office involving moral turpitude, and subjects such an attorney to the discipline of the court, either by way of disbarment, suspension from office, or censure by the court.

Misconduct by an attorney in his professional relations, showing a want of integrity, honesty and fidelity in dealing with his clients, usually carries with it its own sufficient punishment. The general public has its own way of disbarring dishonest, crooked or unscrupulous lawyers, by withholding its patronage and refusing to entrust its business to their care and attention. A dishonest transaction by an attorney at law not only means the loss of the good will and patronage of his client, but such a course of conduct soon results in the loss of standing and reputation

at the bar, and with the public, and then a lawyer's usefulness is practically at an end.

In judging the conduct of the respondent by this case, we are not unmindful of the fact that he has been engaged in the practice of law comparatively but for a short time, having been admitted to the bar in December, 1926; that he worked his own way through school, taking his law course at night; that he is a young man, only 29 years of age; that he was probably laboring under the difficulty of pressing necessities; and finally, that he has, though at a late day, made restitution:—all these matters we have taken into consideration.

We must bear in mind, however, that the public is entitled to protection against the misconduct or unprofessional conduct of attorneys in office, that the want of honesty, integrity and fidelity of attorneys in dealing with clients, not only means loss and damage and injury to the public, but that it also casts reflection upon the Bar and tends to bring the whole profession into public disrepute.

In conclusion, we find from the evidence adduced, including the admissions of the respondent, that he has been guilty of misconduct and unprofessional conduct in office, involving moral turpitude, as charged in the complaint, and it is therefore the judgment and order of the court that said respondent be suspended from his office as an attorney at law, for a period of four months from this date, and that an entry to that effect be spread upon the journal of the court, and such further record of this proceeding be made as the law requires.

With regard to the second complaint, which charges the respondent with misconduct as secretary of the civil service commission, we are of the opinion that his delinquency in that respect, whatever it may have been, was wholly outside the limits of his office as an attorney at law, and therefore beyond our jurisdiction, and hence we have given the second complaint no consideration whatever.

### CHARGES AGAINST ARTHUR B. LEVENBERG.

In this proceeding, the respondent Arthur B. Levenberg, an attorney at law, heretofore practicing at the Trumbull county bar, is charged with misconduct and unprofessional

conduct in office, involving moral turpitude, and his removal from office and disbarment is sought by the committee in charge of the prosecution in this case.

The specifications allege that prior to the 10th day of November, 1928, the said Arthur B. Levenberg received for collection from the Wilbur Collection Agency, of New York, an account against J. G. Koehler and L. Gedson, in the sum of $75.00 or more, together with $7.50 deposit for costs, and that said respondent collected from said debtors $75.00 or more, which he has converted to his own use, and has never paid said money or any part thereof to the parties to whom it belonged.

We find from the proof submitted and from the admissions of the respondent that he did collect from the debtors above named the sum of at least $75.00 which he has not up to this time accounted for to his clients, but that he converted said money so collected to his own use. The respondent claims that he entered suit on this account and deposited the $7.50 with the justice of the peace for costs and that he later recovered a judgment in the justice's court; but no record of this proceeding was produced in evidence nor, was even the identity of the justice established with any degree of certainty. It would seem from the testimony that the respondent kept no record of this collection, at least no memoranda of any kind was offered on the trial, and the respondent is now unable to say definitely how much money he received on this collection, or from whom, or to give the dates when payments were made. His recollection with regard to this item of business is exceedingly vague and uncertain, many questions being answered by a common form, I don't remember. He does admit, however, that frequent demands were made by his client for an accounting, which he neglected to furnish, prior to the commencement of this action, although the account had been in his hands since November 10, 1928, a period of more than four years. Under date of January 5, 1933, he received a letter from the Wilbur Mercantile Agency demanding immediate payment of $151.05 and an accounting for the $7.50 court costs. This amount of money the respondent says on the stand he is willing to pay, although he offers no explanation why, if that be true, he has not al-

ready paid the account. He further states that he had this collection upon the Commercial Law League rates, which would mean upon a commission basis, and which would require a prompt remittance of the amount collected, less his commission fee, and that no charge should be made where no collection was received.

Referring to this account the respondent when asked by counsel what he did with the money collected, replied that he took it home and used it, and the proof shows that no restitution has ever been made.

It is said by the Supreme Court in *State* v. *Hand*, 9 Ohio, page 42, which was a disbarment proceeding, that where an attorney at law has collected money for his client withheld its payment and applied it to his own use, he may be suspended for malpractice. And the court adds that honesty and fidelity to clients are the essential virtues of an attorney's calling, and whenever courts are satisfied he has lost these essential qualifications, they are wanting in *their* duties, if they do not take away his means, and destory his opportunities of mischievous action.

This standard of professional conduct as applied to attorneys at law in this state, relating as it does to their honesty, integrity and fidelity in all their professional relations and business intercourse with clients, has never been modified by our court of last resort, and is the rule adhered to by all courts of the state in proceedings of this kind. Indeed, the scope of the rule was enlarged by the Supreme Court in the Thatcher case, 80 O. S. 492, likewise a disbarment proceeding, when it declared the real question in cases of this kind is whether under the facts admitted and proved the respondent appears to be a fit person to be longer allowed the privilege of an attorney; whether he has shown himself, by lack of appreciation of ethical standards and by unworthy conduct, to be no longer worthy of being recognized as an officer of the courts.

As a sidelight on the character of the respondent, the record discloses that in the history of his practice since his admission to the bar, he has heretofore been charged with defalcations or misapplication of funds collected for clients, and he does not seriously deny that such delinquencies aggregated approximately $7,000.00; and while we would not

be warranted in disbarring the respondent on account of such professional misconduct, inasmuch as it is not included in the specification of charges, nevertheless we have the right to take into consideration for whatever light it may shed upon the respondent's professional character.

From the admissions of the respondent made on the witness stand, and from all the evidence in the case, we are clearly and fully satisfied that the respondent has been and is guilty of misconduct and unprofessional conduct in office involving moral turpitude as charged in the complaint and specifications herein, and that on account thereof he should be removed from his office as an attorney at law.

It is therefore, the finding, judgment and order of the court that the said Arthur B. Levenberg be removed from his office of attorney at law and disbarred from the further practice of his profession, and that an entry of his removal be spread upon the journal of this court and such further record be made as the law requires.

### CHARGES AGAINST BARRETT F. BROWN.

The charges against Barrett F. Brown are two in number. The first specification in substance in that Barrett F. Brown, as an attorney, in the month of December, 1931, was engaged by one C. H. Haas as his attorney, and as such recovered a judgment for one hundred dollars ($100.00) against the Warner Company of Warren, Ohio; that thereafter he collected upon said judgment one hundred dollars ($100.00) and has refused to account for the same.

In the second specification, it is charged that respondent received from the said C. H. Haas twenty dollars ($20.00) as the attorney for Verna Pauling Humphrey, of which $15.00 was to be used as costs or security for costs and $5.00 on his fee in filing an annulment proceeding. It is charged the money was not so used and that respondent has appropriated the same to his own use. Respondent by answer admits the receipt of the money as alleged but denies any misconduct in office or unprofessional conduct involving moral turpitude, and by way of further answer says the complainant C. H. Haas is indebted to him.

The testimony as to the details of the transaction in specification No. 1 leaves much to be desired when we take

into consideration the last defense in the answer of respondent, to-wit: "That complainant owes him."

It will be noted in the first specification that no charge of conversion is made, but only that respondent has failed to account for funds collected. It is respondent's contention that the value of his services generally for Haas is equal to or greater than the $100.00 collected on the judgment. There is evidence to the effect that he has interviewed Brown on a number of occasions upon matters of a legal nature. From all the evidence, the court is of the opinion that cross demands existed between the parties. Upon final accounting, it is possible that no money would be coming to Haas. Haas is not saying that Brown owes him anything; he says, "He is not the judge," meaning thereby we take it that he is not qualified to fix legal fees.

A controversy over fees alone is not the predicate for a disbarment proceeding. However, as his attorney, Mr. Brown owed a duty to his client Haas. For not accounting he must be censured. His failure to contact his client within a reasonable time after his service was rendered (notwithstanding his claim that he tried to interview him) and advise him of the status of his account was a violation of the rules and proprieties of the profession. Haas knew that Brown had collected $100.00 on a judgment in his favor, and he had a right to know what disposition had been made of the matter. He must leave nothing to conjecture or surmise on the part of his client lest he should alienate the favorable opinion of the profession to which it is entitled. As an attorney he is a member of an ancient and honorable profession and he must not by inattention and neglect of matters of trust nature bring reproach upon his fellow members. By so doing he comes close to disregarding his oath "that he will to the best of his ability discharge the duties of the office of attorney and counsellor at law." His acts and conduct in this matter could well be the forerunner of more embarrassing situations and should be avoided.

The second specification is much like unto the first in that it involves failure of respondent to account. The evidence shows that the proceeding for which respondent was

employed was instituted, and even though the case did not go forward, Mr. Brown would be entitled to some fees. This item links up with the service in the Warner case and called for an accounting after the service was at an end. The attempt of Mr. Brown to escape making a deposit for costs by substituting a poverty affidavit when he was entrusted with funds for that purpose is not to be commended. The motive back of it was that he might benefit personally by retaining the deposit and apply the same on his fees. And to do this, he plans to have his client swear to an affidavit contrary to the fact. Had he carried his plan to a conclusion, it would have been evidence of a disregard for his obligation of fidelity and confidence to his client and honesty with and disregard for the court. However, since it was not consummated, it is possible that he might have recanted of his scheme and been saved the ignominy of such an accusation.

From all the evidence in the case a failure to carry out his plan with regard to the affidavit, the showing of some claims due the respondent, and other uncertainties and indefiniteness of the testimony we are not fully satisfied that respondent is guilty of unprofessional conduct involving moral turpitude and give him the benefit of the doubt. We do think, however, that his conduct merits the public censure of the court and conclude with the suggestion that Barrett F. Brown read again his oath of office and in the future adhere more strictly to his obligation and the rules and proprieties of his profession.

## Charges Against Charles H. Woodworth.

In this case Charles H. Woodworth, an attorney, is charged with misconduct in office involving moral turpitude; and also that the respondent is guilty of unprofessional conduct in office involving moral turpitude.

*Under the first and only* specification, it is alleged that Charles H. Woodworth was appointed by the Common Pleas Court of Trumbull county, Ohio, on March 10th, 1924, receiver in the case of *P. H. Schlegel* v. *The Western Reserve Mortgage & Abstract Company;* that as such receiver there came into his hands sixty two hundred sixty-eight dollars and sixty-six cents ($6268.66) which sum it is claimed he appropriated and converted to his own use. Respondent ad-

mits his appointment and denies any misconduct in office, denies he has been guilty of unprofessional conduct involving moral turpitude and finally denies that he converted any sum whatsoever to his own use. Upon the stand, respondent admits the receipt of the $6268.66 as charged. In fact his account as receiver filed in this court January 29th, 1931 and sworn to by him shows that sum as the balance due the receivership in his hands.

The testimony of respondent is that he carried this fund in his private account in the bank and not as a receiver, a practice which cannot be countenanced.

Upon the filing of the account, the court ordered the balance, to-wit, $6268.66, turned over to the court. This was not done, and respondent admits his inability to do so because he was not in possession of the money. Later, however, the evidence shows fourteen hundred and nineteen dollars and eight cents ($1419.08) turned to the court by Woodworth under an assignment from creditors and five thousand dollars ($5000.00) was paid by his bondsman by reason of his default to the succeeding receiver; that but a part of the assigned claims have been paid, and Charles H. Woodworth still owes on the deficiency. It is in evidence that respondent is possessed of but little property at the present time. We infer from his testimony that he has no liquid assets. The fund coming into his hands has all been checked out as he would use any personal account on individual use and private enterprise.

The testimony of Woodworth is novelistic in character. He felt he was so anchored in a financial way, having as he testified, a worth of fifty to sixty thousand dollars jointly with his wife, that trust funds in his hands were always safe and that he wasn't charged with any special care in their preservation. He suffered a reversal in financial affairs and due to his practice of not keeping separate this trust fund, it too got caught in the wreck. He sought to profit from the use of another's property entrusted to him for a special purpose. It has been urged that because respondent acted in a representative or fiduciary capacity, he is not amenable to the courts in a disbarment proceeding, but to this we cannot agree, nor are we without authority to support our position as heretofore mentioned.

Charles H. Woodworth was not only an attorney, but by his appointment to his receivership he had become an arm of the court. As suggested, he received money and became a trustee of the highest character. From the skill and learning that he possessed, and needed in administering this trust he cannot be heard to say that for the time being he has divorced himself from the virtues of honesty, probity and square dealing expected in an attorney. As an attorney and representative of the court, his acts evince a lack of that honesty and integrity which are the essential qualities of an attorney. It is impossible to find any excuse or palliation for the gross betrayal of the trust imposed upon him. His conduct brings reproach upon the legal profession and tends to alienate the favorable opinion which the public should entertain concerning it. It slaps at the public administration of justice because it is a recognized fact that attorneys play an important part in the making of our laws and in administering the property rights of individuals in our courts. This is their privilege because they are attorneys, their office is a badge of respectability and trustworthiness. It is known that their certificate of practice speaks for a high standard of business dealing, and the receiver attorney who has converted money coming into his hands by reason of his court position is guilty of misconduct in office involving moral turpitude, as herein defined.

So in this case we find from all the evidence in the case and are fully satisfied that respondent has been guilty of misconduct in office and unprofessional conduct in office involving moral turpitude as charged in the specifications, and his license as a practitioner should be revoked.

It is therefore the finding and judgment of the court that the said Charles H. Woodworth be disbarred from the future practice of law in Ohio and his name stricken from the rolls and that an entry of his disbarment and removal be spread upon the journal of this court, and such further record be made as the law requires.

CHARGES AGAINST WARREN THOMAS, SPECIFICATION NO. 1

Specification No. 1 charges that Warren Thomas, as attorney for one Louis Mating, recovered a judgment in the Common Pleas Court of Trumbull county, Ohio for $185.60

on May 12th, 1932; that motion for new trial was over-ruled and on June 30, 1932 the defendant in the case, Benjamin Saddle, paid to Warren Thomas as attorney for Louis Mating $62.50, and that thereupon Warren Thomas entered a full satisfaction of the judgment on the docket; charges that Warren Thomas was to receive 50 per cent of the amount recovered as fees; that he has paid Louis Mating $2.00 and has converted the balance of $29.25 to his own use and settled the judgment without consent or authority.

Warren Thomas, by his answer, denies that he has been guilty of misconduct in office or of unprofessional conduct involving moral turpitude. The evidence in this case establishes the facts set forth in the specification, to-wit: that respondent acted as an attorney for Louis Mating and as such recovered judgment for him for $185.60 on June 24, 1932, settled the same on June 30, 1932 for $62.50, received the money and paid Louis Mating $2.00 up to the time of the filing of this specification. It now further appears by the evidence that since the filing of the specifications, Thomas has paid Mating an additional amount of $32.00. In justification for his action in settling the judgment of $185.60 for $62.50, releasing the same on the docket, repondent says this was in pursuance to his original agreement with his client, Louis Mating. This agreement is denied by Louis Mating, and all he says in that Thomas was to receive 50 per cent of what he recovered. The burden of proving his claim in this regard rests with Thomas, and we think in that he has failed. He does testify and is supported in that by his stenographer that he said he would not take the claim unless he was free to use his own judgment in the matter of settlement. Granting that he made such a statement, we are not satisfied and do not feel that in the light of subsequent happenings there was such a meeting of the minds of Thomas and Mating as would constitute an agreement. Thomas is dealing with an uneducated client, one who could not read, he could not write, and when he was apprised by his frequent visits to his office demanding one half of $186.60, he, Thomas, should have realized that Mating did not understand the agreement to be such. Then would have been the time to definitely settle the matter, because the judgment had not been released at

the time of the first visit of Mating to the office of Thomas. Professional conduct, fidelity and honesty to his client would demand that in the face of his client's claim for one half of $186.60 that he come to a definite and clear understanding as to this existing judgment and proposed settlement. His client was lacking in business experience and likewise education which would call for candid and frank dealing. If we concede that there may have been some talk on the part of Thomas that he reserved the right to use his judgment in making a settlement, it should be limited to the item as a claim in his hands and could not reasonably be expected to apply to a verdict once obtained, motion for new trial overruled and judgment entered upon the verdict, and especially when said judgment was protected by an appeal bond that guaranteed its payment. Under such circumstances, it is inconceivable that anyone would question that it was the duty of an attorney in keeping with professional ethics to take the proposed settlement up with the judgment creditor and obtain his consent to whatever was done. If the minds of men might differ as to Mr. Thomas' manner of handling the judgment, the fact remains that he did collect $62.50 on the judgment in June, 1932, and paid nothing thereon until November 8, 1932. There is no attempt to show how or where he kept this fund. His retention of it under the circumstances, in face of repeated inquiry and demand is inexcusable. We are of the opinion that under this specification the evidence shows respondent guilty of misconduct in office and of unprofessional conduct involving moral turpitude.

CHARGES AGAINST WARREN THOMAS, SPECIFICATION No. 2

In the second specification, Warren Thomas is charged with conversion of $1,000.00 placed in his hands by J. O. Harris of Brady Lake, Portage county, Ohio, on March 26, 1927, as indemnity to secure any person signing a recognizance for release from county jail, Trumbull county, Ohio one Webb Hudson, then held under indictment charging the commission of some crime.

In June, 1929, the indictment against Webb Hudson was nolled and he was released from jail. At the same time the recognizance was discharged and surety released; that

thereafter said J. O. Harris demanded of Warren Thomas the return of the $1000.00, but payment was not made.

In July, 1931, J. O. Harris filed an action in the Court of Common Pleas of Trumbull county Ohio against Warren Thomas asking judgment for the sum of $1000.00 because of the conversion of said sum.

In answer to said petition, Warren Thomas claimed to have paid Clyde Sherman $125.00 in consideration of the said Sherman signing the recognizance and claimed to be entitled to the further sum of $150.00 as attorney fees.

Thereafter Warren Thomas paid the sum of $400.00 upon an agreed settlement of $700.00 but has failed to pay the balance to J. O. Harris as per agreement of settlement.

Respondent in his answer denies that he has been guilty of misconduct or unprofessional conduct in office involving moral turpitude.

The evidence relative to this specification conclusively establishes conversion of the major portion of the fund by the respondent Thomas. And there is not an extenuating circumstance to palliate or excuse his conduct.

In fact, the evidence disclosed a more grave and wanton conversion than is set out in the specifications.

For instance, the $1000.00 received by respondent Thomas from Harris on March 26, 1927 was deposited in the Citizens Commercial & Savings Bank of Warren, Ohio, on that day to his personal account and by April 2, 1927, or seven days thereafter, the entire amount had been checked out and all except $100.00 for his personal use.

The $100.00 is claimed to have been paid to Clyde Sherman as a fee for signing the recognizance.

The claim of the respondent Thomas that he had a right to use the $1000.00 and account for the same when the proper time came is denied by Harris, and in view of the purpose of the deposit, the claim is so unreasonable that the court cannot accept it.

The fact is not controverted that the primary purpose in making the deposit of $1000.00 by Harris was to secure a resident bondsman who would sign the recognizance for the release of Hudson from jail. The only way in which this $1000.00 would protect the bondsman would be either to have it in his own possession or in escrow with a third

party, to be available at all times if the bond should be forfeited. After the respondent within a weeks time had checked out $900.00 of the fund for his personal use, the bondsman had no security to protect him except as he would look to Thomas.

The bondsman Clyde Sherman was called as a witness for respondent and testified that he was interested in knowing how he was going to be protected other than getting $100.00 for signing the bond. And quoting from the testimony, he says that Thomas told him "I have this check for $1000.00 and it is mine and I will keep it and I will protect you."

The testimony of the bondsman Sherman very positively indicates that he did not regard the check of Thomas good except as he deposited the $1000.00 from Harris and then drew the check against it.

To quote further from the testimony of Sherman, he uses this language. "The check wouldn't have been good if he hadn't. That's a fact."

Even if the claim of Thomas could be accepted that he had a right to use the $1000.00 for his personal use, and account for it when the proper time came, the fact remains that he didn't account at all and has not to this day.

Under any circumstances, it was the duty of Thomas to account to Harris when the indictment against Hudson was nolled and the bondsman released. This occurred on June 29, 1929.

. After the indictment against Hudson was nolled and the bondsman released, Harris made demand on Thomas for the return of his $1000.00 and was met with the reply that he, Thomas, had turned it over to the bondsman Sherman. Harris then saw Sherman and afterwards returned to Thomas and told him that Sherman denied having received the $1,000.00, after which Thomas told him that he would see Sherman and return the money.

At this time, respondent made no claim for fees out of the fund. Mr. Harris, after waiting a reasonable time, again called on respondent and on this second demand was told that the money would be sent in the near future. Again waiting a reasonable time, Mr. Harris in company with his attorney, Judge Caris of Ravenna, called on respondent but no settlement was obtained.

Judge Caris made efforts by phone, letters and further personal calls to collect from Thomas, and finally learned for the first time that Thomas claimed he had paid $125.00 to Sherman for signing the recognizance, and also was charging $150.00 for legal services.

In the interests of getting the claim settled, these charges were allowed and respondent agreed to remit the balance, which he failed to do.

Later and after the first time respondent made a further claim against the fund for attorney fees in defending Hudson on criminal charges in Mahoning county. This demand was refused by Harris and his attorney and there is nothing in the evidence in this hearing that would show the slightest justification for this charge against Harris.

In January 1931, Harris filed suit against Thomas in the Court of Common Pleas of Trumbull county, Ohio, for the full amount of the deposit. To this action this respondent filed answer and claimed credit for $125.00 paid Sherman as bondsman and $150.00 as attorney fees for arranging the security on the bond and securing the release of Hudson from jail and representing Hudson in the criminal charge.

Respondent in his answer attempts to aver some equitable claims against the funds by reason of his having defended Hudson in Mahoning county. This part of the answer can be characterized only as a legal monstrosity.

Respondent in his testimony before this court admits that Harris neither directly nor indirectly employed respondent to defend Hudson in Mahoning county, nor did he directly or indirectly agree to pay for such services.

It was Hudson and not Harris who was indicted and tried in Mahoning county.

Harris did not furnish bond for Hudson in Mahoning county and says he did not even know of the indictments. All that the respondent claims in that is that Mrs. Hudson left a file with him and that Harris went over the date with him and at that time and afterwards said that he was vitally interested in Hudson's release.

A mere moron in the law would know that no liability would be accrued against Harris thereby.

When the case of *Harris* v. *Thomas* came up for trial, respondent agreed to pay $700.00, $400.00 of which was to

be paid by assignment of a fee in some case and the remaining $300.00 in 60 days.

While this was less than what respondent had agreed to pay on a former settlement, yet again in the interest of settlement, both Harris and his attorney agreed to accept the $700.00.

The $400.00 was paid as agreed, but the $300.00 has not been paid although the 60 days has passed by almost a year.

This court has no difficulty in arriving at the conclusion that the evidence establishes to a certainty that respondent was guilty of conversion, and failure to account for money coming into his hands as an attorney.

Thereby the respondent has been guilty of misconduct and unprofessional conduct in office involving moral turpitude as charged in the second specification.

CHARGES AGAINST WARREN THOMAS, SPECIFICATION NO. 3

Coming now to consider the third specification of the complaint in the matter of charges against the respondent, Warren Thomas, we find that this specification avers that Warren Thomas was appointed executor of the estate of Morris Osborne, deceased, on August 21, 1925, and that on January 4, 1927, he filed his final account as such executor, charging himself with ten shares of stock of Western Reserve National Bank of Warren, Ohio, and $4277.19 in money; that amongst other items of disbursement for which said accountant takes credit is an item of $204.14 of inheritance tax which the complaint avers the respondent has never paid. With reference to this item of inheritance tax the complaint charges respondent with misconduct and unprofessional conduct in office involving moral turpitude and asks that he be disbarred for that reason.

By his answer filed herein the respondent denies generally all charges against him with reference to the third specification of the complaint.

The proof submitted with reference to the third specification shows that on March 11, 1927, the Probate Court of this county had determined the amount of inheritance tax in said estate chargeable on the legacy of Mrs. L. E. Osborne, a beneficiary under the will of said decedent, to be $204.14, and that on said date said respondent filed his first

and final account showing total assets collected and charged against himself as executor of said estate in the sum of $6227.19, and credit claimed for disbursements in a like amount. Included in the distribution, as shown by the executor's account, is an item of $204.14 inheritance tax due on the distributive share of Mrs. L. E. Osborne, for which the respondent takes credit as having been paid by him in connection with the settlement of said estate. The account is verified by the affidavit of the respondent under date of January 4, 1927, before Mabel F. Flickinger, as deputy clerk of the Probate Court.

An examination of the records of the settlement of this estate in the Probate Court discloses that no receipts were filed for any of the items of disbursement, nor are any dates given in the account when the various payments were made; nor do we find any order of the Probate Court approving and settling this account, or allowing the administrator compensation and attorney fees, although he takes credit for $314.54 for his services in the settlement of said estate.

From the testimony of Mr. C. H. Beck, manager of the clerical department of the Second National Bank of Warren, it appears that between September 5, 1925, and October 24, 1925, the sum of $3,150.00 belonging to this estate was withdrawn from the bank on checks made payable to the respondent, and that by May 21, 1926, all money credited to the decedent's account amounting to $4277.19 had been withdrawn on checks payable to the respondent, except a check for $200.00 payable to Camille Osborne and a check for like sum drawn to the order of Mrs. L. E. Osborne, leaving a balance in the account as of date of May 21, 1926, of $10.45, although no inventory and appraisement of the estate was made until December 28, 1926, being a period of more than seven months after the estate had practically all been checked out and disbursed.

In this connection we wish to say that the failure to file receipts for disbursements made, or to give date of disbursements together with the fact that all checks except two were made payable to the respondent, and that $3150.00 belonging to this estate had been withdrawn from the bank by October 24, 1925, and practically all of the remainder by May 21, 1926, leads us to believe that the respondent ac-

tually converted the funds of this estate to his own use, although he has no doubt made restitution of all money so converted and used except $204.14 of inheritance tax. At least no exceptions have been filed to the account.

Under date of August 12, 1932, the London and Lancashire Indemnity Company, surety on his bond learning that the above mentioned item of inheritance tax had not been paid, filed a motion in the Probate Court asking that respondent be cited to appear and show cause why the same had not been paid, and an order was accordingly issued by the court and under date of September 21, 1932, the respondent having failed to show that said tax had been paid or to show why it should not be paid, the court entered an order requiring respondent to pay said inheritance tax in the sum of $204.14 and to file a receipt therefor by October 20, 1932. The proof shows that no compliance with this order has been made by respondent, nor have frequent and insistent demands by the surety company been of any avail.

While the respondent has entered a general denial in his answer herein of the charges made in the third specification of the complaint, it should be noted that he did not take the stand and offer to deny or explain the charges made against him in open court, nor did he tender any testimony in his own behalf on the trial, so that there is practically no dispute so far as the facts in this particular case are concerned. Upon consideration of the evidence contained in the record we are obliged to find that the respondent as executor of the estate aforesaid, has misappropriated and converted to his own use the said sum of $204.14 and has failed, neglected and refused to account therefor. We further find on the issue joined that said respondent has been guilty of misconduct and unprofessional conduct in office, involving moral turpitude, as charged in the third specification.

CHARGES AGAINST WARREN THOMAS, SPECIFICATION NO. 4,

This specification deals with the administration of the estate of one Henry A. Simon who died in January, 1921, Warren Thomas and one H. C. Brillhart having been appointed March 23, 1921, the executors of the decedent's will. It is alleged in said specification by the terms of the will of Henry A. Simon a trust fund of $2000.00 was to be in-

vested in real estate loans in Trumbull county property by said executors as trustees and the net proceeds were to be paid to one May Ebling during the term of her natural life. It is further alleged that since the appointment of the said Warren Thomas, he, the respondent, has paid to May Ebling at divers times from the 4th day of June, 1923, to the 31st day of December, 1931, the sum of $700.00, and finally says that at the time of the filing of this specification there was due the said May Ebling and unpaid to her the sum of $450.00 from said trust fund which they charge the said Warren Thomas has refused and neglected to pay.

The same pleading of a general denial applies to this specification as to others.

The testimony in this particular shows that while H. C. Brillhart was appointed as one of the co-executors he has not participated in any degree in the administration of this estate and that the same has been entirely handled by the co-executor, Warren Thomas.

The evidence further shows that during the period from March, 1921, to the present date the said May Ebling has received from the said Warren Thomas as distribution from said trust fund as interest the sum of $920.00.

An examination of the executor's account filed in the Probate Court on October 21, 1932, discloses that from various sources the said executors have collected and charged themselves with the sum of $13,159.51 and that during said time they have credited themselves with disbursements of the sum of $13,159.51 which includes, however, a balance for costs and distribution of $318.81.

An analysis of said account discloses that no charge has been made in said account by the said executors as income from the trust fund of $2,000.00.

A further examination discloses, however, that a credit of a transfer to the trustee's account for the use of Mrs. May Ebling has been taken in the sum of $2000.00, and further that said executor takes credit for having paid to the said May Ebling on interest account the sum of $800.00. Over this period of time deducting the first year of the administration of the trust there would have accumulated at the legal rate of interest on said trust fund the sum of $1,-320.00. As against that it is admitted by the *cestui que*

*trust,* Mrs. Ebling, that she has received to date $920.00, thus leaving a balance due her of $400.00 which has not been paid. No proof has been offered that this trust fund of $2000.00 has ever been invested by the executors in accordance with the direction of the testator nor is any statement made or explanation offered by the respondent as to where that $2000.00 is now invested or located. But on the contrary, in conversations with a Mr. Hittle an attorney and in talks with the said May Ebling on several occasions the respondent said he had no money but would pay in the near future notwithstanding the fact that he takes credit in his account for having received that trust money in the sum of $2000.00 in a trust capacity.

The testimony shows that as late as Labor Day in 1932 he said he would pay $400.00 and the balance in several weeks which apparently has not been done.

It further appears from a statement attached to the executor's account that ten acres of land belonging to said estate remain unsold which the testimony shows has a probable value of $100.00 and except for this small tract of land it would seem that all of the assets of the estate have been disbursed. And from the discrepancies apparent in the account and the uncontradicted evidence in the case we can come to but one conclusion and that is that this trust fund has been converted to his own use by the respondent. That the account as filed is manifestly irregular and the filing of a proper account would disclose the investment of the $2,-000 as required by the will and contemplated by statute.

It is somewhat remarkable that in the face of the charges made against the respondent in this case and the evidence adduced that he should decline to take the stand and explain or justify his management of this estate and especially the trust fund which he admits came into his hands out of the proceeds of the property sold. By his silence in this respect the respondent virtually admits that he is in default for non-payment of $400.00 of interest due Mrs. Ebling on the trust fund and we are forced to the conclusion that the respondent has been guilty of malpractice and misconduct in the administration of this estate.

We therefore find upon consideration of the evidence adduced that the respondent has been guilty of misconduct

and unprofessional conduct in office involving moral turpitude as alleged in the fourth specification of the complaint.

CHARGES AGAINST WARREN THOMAS, SPECIFICATION NO. 6

It is charged on the 2nd day of February, 1926, one Nick Dumitressa was appointed by the Probate Court of Trumbull county, Ohio, administrator of the estate of John Florea, and that as such administrator, he employed Warren Thomas as his attorney to respresent him in the administration of said estate, alleges that an inventory was filed showing an estate amounting to $788.20, and further alleges that on the 5th day of June, 1928, the said administrator filed his account under the direction, supervision and instruction of the said Warren Thomas, as his attorney, in which it is alleged that said administrator credited his account with payment of claims in the amount of $788.20.

It is further alleged that at the time of the filing of the account, the said administrator requested his attorney, Warren Thomas, to turn over to him sufficient money to pay the bills enumerated in the final account, and to also surrender to him, the said administrator, the sum of $367.41 as due the heirs of John Florea and this it is charged he failed to do. And in conclusion, says that the said Warren Thomas refused and failed to account to the administrator for the balance of the funds in his hands, which he includes, $7.00 to Dr. L. V. Kennedy; $42.00 to St. Joseph's Riverside Hospital; $42.00 for sundry funeral expenses, and $47.00 due the said Nick Dumitressa as administrator for expenses in addition to the sum of $367.41 for distribution to the heirs.

The evidence adduced in this case shows clearly that the estate in fact was administered by Warren Thomas as the attorney for the administrator, he receiving and being charged with all the assets of the estate.

The evidence further shows that the account was filed by the administrator, in the Probate Court, under the direction of Warren Thomas, as his attorney, as plead in the specifications.

The evidence further shows that the claim to Dr. L. V. Kennedy in the sum of $7.00, the item of sundry funeral expenses in the sum of $42.00 remains unpaid, and further that at the time of the filing of these specifications the item

of $42.00 to Riverside Hospital was unpaid, but which item was paid by the respondent on January 9, 1933, the date of the beginning of this hearing.

The evidence further shows that repeated demands have been made upon Warren Thomas attorney by his client, the administrator in this estate, for the furnishing of sufficient funds to pay the bills and claims for which credit has been taken in his account, but all to no avail.

Having found by the evidence that Warren Thomas as attorney for administrator was entrusted with the funds of this estate, it became his duty upon demand to pay the same to the administrator and this he failed and refused to do. But on the contrary, converted the same to his own use, which act we find was misconduct and unprofessional conduct in office, involving moral turpitude, as alleged in the 6th specification of the complaint herein.

The court having made findings that the respondent Thomas was guilty of misconduct and unprofessional conduct in office, involving moral turpitude, in the specifications of the complaint Nos. 1, 2, 3, 4, and 6, it is now the order of the court that the said Warren Thomas be removed from his office as attorney at law and disbarred from the further practice of his profession under each of the foregoing specifications, Nos. 1, 2, 3, 4 and 6; and that an entry of his removal be spread upon the journal of the court and such further record be made as the law directs.

In exercising summary jurisdiction to suspend or disbar attorneys, the object which the courts have in view is to remove from the profession a person whose misconduct has proved him unfit to be entrusted with the duties and responsibilities belonging to the office of an attorney.

The disbarment is for the protection of the court and the public; if a punishment is thereby inflicted, it is wholly incidental. 4 Ohio Jurisprudence Section 133.

We think the facts show such wanton misconduct on the part of the attorneys ordered disbarred that it is proper for us to say that the committee is to be commended in bringing the question to the attention of the local courts.

None of the respondents or their friends can justly criti-

cise the committee or the local courts for starting the legal machinery in operation that finally culminated in bringing the respondents to trial.

To the layman it may seem action has been long delayed in view of the fact that some of the respondents for a long period of time have been engaged in reprehensible and inexcusable conduct in the practice of their profession.

We as lawyers (and each of us were practicing attorneys before we took on the ermine) know how embarassing it is to make public denouncement of the conduct of our brother lawyers.

It is preferred that the bar of public opinion would so assert itself that the recreant lawyer in the interest of his preservation would have so changed his conduct to conform to the canons of legal ethics.

There comes a time, however, when the unprofessional attorney, like the racketeer, may become so entrenched that drastic action must be taken in order to preserve the whole profession from scandal and reproach.

It is unquestionably true that the misconduct of one or a few miscreant lawyers will cause aspersions to be cast on the entire Bar.

We are pleased that each of the five respondents have been represented by counsel.

It is an old axiom that the attorney who represents himself in a law suit in which he is personally interested has a fool for a client.

Just as a physician or surgeon does not minister to himself or his family in serious sickness, just so the lawyer needs able counsel when he is in serious trouble.

In the presentation of the defense, for the respondents, eminent counsel have digested the law and presented it to the court. In meeting the specifications, every fact in explanation or extenuation has been brought out.

Nothing has been left undone in the interests of their clients. Every disputed question of law or fact has been presented with zeal and earnestness and always with decorum and in the furtherance of an order of trial.

We are sorry indeed that it is necessary to make orders of censure, suspension and disbarment but we have a duty to perform, and that duty we have met as we see it.